**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS WORTH DIVISION**

| | | |
|---|---|---|
| **LARRY EAVES,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | **Case No. 3:19-cv-1153-B** |
| | § | |
| **UNITED TECHNOLOGIES CORP.,** | § | |
| | § | |
| *Defendant.* | § | |

---

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Now Comes Plaintiff, Larry Eaves, and files this Response to Defendant's Motion for Summary Judgment, in support of which would respectfully show the Court the following.

TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

I.    SUMMARY OF ARGUMENT ...............................................................................1

II.   THE FACTS ............................................................................................................1

   A.   LARRY EAVES WORK HISTORY ...............................................................2

   B.   TIFFANY MCCORD ......................................................................................4

   C.   KROGER'S MANAGER DID NOT TAKE MCCORD SERIOUSLY...........5

   D.   MCCORD'S EMPLOYER—PL MARKETING.............................................6

   E.   THE SHAM INVESTIGATION.....................................................................7

   F.   BLATANT PRETEXT .....................................................................................9

   G.   REPLACEMENT ..........................................................................................15

III.  THE LAW...............................................................................................................15

   A.   SUMMARY JUDGMENT STANDARD ....................................................15

   B.   TCHRA STANDARD ..................................................................................16

   1.   Prima Facie Case .........................................................................................16

   2.   Pretext ..........................................................................................................19

IV.   CONCLUSION......................................................................................................21

CERTIFICATE OF SERVICE...........................................................................................23

TABLE OF AUTHORITIES

**Cases**

*Appel v. Inspire Pharmaceuticals, Inc.*, 712 F.Supp.2d 538  (N.D. Tex. 2010) ........................... 19

*Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955  (5th Cir.1993) ....................................................... 17

*Ion v. Chevron USA, Inc.*, 731 F.3d 379  (5th Cir. 2013) .......................................................... 20, 21

*Machinchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005) ................................................. 15, 18

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 1824 (1973) ....................... 16

*Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629 (2012) ......................................... 16

*Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75 (1993). .................................................... 17

*Rachid v. Jack in The Box, Inc.*, 376 F.3d 305, 314, fn. 13 (5th Cir. 2004) .................................. 20

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133  (2000) ........................................... 17

*Rhodes v. Guiberson Oil Tools*, 75 F.3d 989  (5th Cir. 1996) (*en banc*) ................................. 17, 19

*Sanders v. Casa View Baptist Church*, 898 F. Supp. 1169 (N.D. Tex. 1995), *aff'd,* 134 F.3d 331

(5th Cir. 1998) ............................................................................................................................ 17

*Stanton v. Jarvis Christian College*, 417 F.Supp.3d 811 (E.D. Tex. 2019) .................................. 19

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981) ............................ 16

*Texas Dep't of Aging & Disability Servs. v. Loya*, 491 S.W.3d 920  (Tex. App. 2016) ............... 17

*U.S. Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711,  103 S.Ct. 1478, 75 L.Ed.2d 403

(1983). ........................................................................................................................................ 17

**Statutes**

TEX. LAB. CODE ANN. § 21.051(1) (West 2015) .......................................................................... 16

## I.      SUMMARY OF ARGUMENT

The Defendant's argument is not an honest one.  The law doesn't require the employer to be right about its decision, but it does require them to be honest.  An honest review of the facts makes it very clear that the Defendant sided with a woman accuser who was a stranger, and against its own twenty-year employee, based upon gender or, alternatively, age.   Inexplicably, the Defendant continues to hang its hat on an assertion that Mr. Eaves lied about being at the Kroger—as if the Court (and a jury) could not listen to what Mr. Eaves actually said, which is far different than the Defendant represents.  The Defendant chose to fire Mr. Eaves because a female had accused him of "sexual" misconduct and did not care whether the accusation was supported by evidence—taking sides based upon gender, which is the epitome of discrimination. Mr. Eaves was replaced by someone substantially younger and has an age claim on an alternative basis. The Defendant violated its own policies by determining to fire Mr. Eaves before any investigation.  The Defendant's blatant mischaracterization of the evidence is the very definition of "pretext," and cannot support a summary judgment.

## II.     THE FACTS

Before reviewing in substantial detail the facts of this case, Plaintiff offers 1) some of the most telling testimony from Carrier's HR representative (Will Lively) whose "investigation" of the allegations of Ms. McCord were the basis for firing Mr.  Eaves; and 2) the admission that Carrier set out to do a sham investigation with termination in mind in violation of its own policies:

1) Testimony of Will Lively

Q:  Can you disprove a single thing that Larry said?
A:  With facts?
Q:  Yes.  Of course.
A:  I can't

1

Q:  Can you prove a single thing that Ms. McCord said?
A:  No.
(Appx. 65 l. 9—16)

2) Email of Area Operations Manager, Stan Davis, Before the Investigation

"In *our* opinion Larry Eaves should be immediately released from employment with Carrier because of this incident....As you perform our investigation, [here is contact information]." (emphasis added)  (Appx. 149)

This itself violates Carrier policy. (Appx. 137-147).  Mr. Lively admits that Mr. Davis wanted

Eaves fired just based on the woman's allegation alone.    (Appx. 68, l. 11—19).

    A.  LARRY EAVES WORK HISTORY

    Larry Eaves worked for Carrier for over twenty years. (Appx. 1-4).  He hired in as a

journeyman mechanic and after approximately five years, worked his way up to HVAC Control

Technician.  Id. As an HVAC Control Technician, he installed controls in commercial buildings

or ran service calls on such controls, including hospitals, colleges and school districts. Id.  In

performing his job, Mr. Eaves regularly interacted with Carrier clients on a daily basis—both

men and women. Id.  For fifteen years, he interacted with clients in the field without a single

complaint of any kind.  Id.  Indeed, his last evaluation was very positive.  It was completed by

his female boss, Amy Bell.    (Appx. 156).   While Carrier claims to have "lost" this great

evaluation (Appx. 157-159), Larry had taken a picture on his phone of the summary, which

concludes with "I am very grateful to have him as part of the team here in Dallas!"  (Appx. 156).

    On March 26, 2018, Mr. Eaves went to the Arlington Kroger store over his lunch hour to

grab a few grocery items.  (Appx 1-4).  He began checking out and realized he had forgotten to

get lunch bags (as he planned to put Easter goodies in them for his grandkids).  *Id*.  He asked the

cashier to quickly pause while he grabbed some lunch bags and he asked her where the lunch

bags were.  *Id*. She told him aisle 14.  *Id*.  As Mr. Eaves approached aisle 14, he could see a

worker surrounded by boxes. *Id*. She was wearing knee pads and tool belt and she was crouched down doing something with the products. *Id*. Mr. Eaves made a comment to her about her knee pads, to the effect of that "it's a good thing you are wearing those or you would be like me, having to have your knees replaced." *Id*. At the time, Mr. Eaves was scheduled to have surgery to replace both knees on April 5th. *Id*. He went past her, got the lunch sacks and then went back up the other aisle, back to the cash register and checked out and went home. *Id*.

At the time, Mr. Eaves was working a job in Dallas installing controls for Rolex in a new building. (Appx. 1-4). Then he got a call to go to an emergency in Wichita Falls and worked there for three days. *Id*. He was told by Stan Davis that an Arlington detective was wanting to speak with him, but Davis did not tell Eaves why and Eaves had no idea why. *Id*. Eaves called and left a message for the detective. *Id*. As Mr. Eaves pulled up into his driveway back from Wichita Falls, the detective called him back. *Id*. The first thing he asked was if Mr. Eaves had been at a Kroger store approximately two weeks before. *Id*. Mr. Eaves was taken by surprise and was not focused at all on the Kroger store. *Id*.  Thinking back, he could not recall the exact series of days and dates that he had been at the various jobs and it took him a few minutes to recall going to Kroger and getting the groceries and lunch sacks (as that had been uneventful as far as he was aware). *Id*.

Mr. Eaves then had knee surgery on April 5, 2018. (Appx. 1-4). He was to return to work on June 3, 2018. *Id*. That morning, he had a conference call with Will Lively, Amy Bell, and Stan Davis. *Id*. Will Lively questioned him about his visit to Kroger. *Id*.  Mr. Eaves was then suspended from work and subsequently on June 6, 2018 Will Lively and Stan Davis called him and told him he was fired.  *Id*.

On the day that Mr. Eaves was suspended, Amy Bell, who was his boss, walked him out to his truck.  (Ex. 1).  She told Mr. Eaves that she thought that he was being treated unfairly and that he was being discriminated against by the company. *Id*. She said that if he ever needed a recommendation, she would give him one because she had worked around him for ten years and had never had a complaint about his conduct. *Id*.

B.    TIFFANY MCCORD

Tiffany McCord was an employee of PL Marketing who worked at the Arlington Kroger stocking and creating displays.   In March 2018, Ms. McCord reported to Pam Wiley who reported to Garry James.   (Appx. 100, l. 13—19).   Ms. McCord had made allegations of inappropriate conduct a couple of times before she saw Mr. Eaves at Kroger.   One time, she made a complaint to her employer about receiving inappropriate memes from a co-worker. (Appx. 103, l. 16—Appx. 104, l. 23).   Another time she complained that a Kroger customer was "flashing her" in the parking lot.  (Appx. 101, l. 15—Appx. 102, l. 19).   She told Mr. James that when she saw the flasher, she got in her car and left.  *Id*.  According to Mr. James, McCord did not file a police report.  *Id*.

On March 26, 2018, Ms. McCord called the Arlington police to complain that, while she was working at the Arlington Kroger, a customer had touched her waist as he walked by her. When the police officer arrived, she met him outside of the store to give her account of what happened and it was recorded on the officer's body camera.  (Appx. 125).  She claimed that the customer touched her all around her waist, commented on her tool belt and knee pads, then checked out and left.  (Appx. 125).  In the five-minute recorded interview, she is not asked what the comments were about the knee pads and tool belt.  (Appx. 125).  She pointed out the customer to the manager as the customer was checking out.  She somehow managed to get a

picture of his company van before the customer got back in it.  (Appx. 131-133) and she shared that with the officer.  (Appx. 125).  The officer went inside the Kroger and went up to the manager's office to view camera surveillance footage.  (Appx. 125).  While there was no footage of the customer encountering McCord, the camera showed him checking out and leaving. (Appx. 125; 134, 135).  Subsequently, an Arlington police detective contacted Mr. Eaves' employer, Carrier, and let them know about the allegations.   Carrier's Human Resources representative, Will Lively, allegedly conducted an investigation, after which Mr. Eaves was fired.  (Lively Aff., Def. Appx. 211, par. 14)

Plaintiff attempted to take Ms. McCord's deposition in this case and had her properly served with a subpoena.  The deposition was conducted by Plaintiff's female attorney, a female defense attorney, a female court reporter and a female videographer.  (Appx. 89, l. 2—19). Ms. McCord began "pleading the fifth" right away.  (Appx. 90, l. 16—Appx. 91, l. 3).  After a brief discussion of her background at PL Marketing, Ms. McCord began pleading the fifth again. (Appx. 92, l. 13—Appx. 95, l. 21).  She ultimately refused to answer any further questions and terminated the deposition.  *Id.*

## C.    KROGER'S MANAGER DID NOT TAKE MCCORD SERIOUSLY

The Kroger Store Manager, John Robinson, has no recollection of the alleged encounter or of Mr. Eaves because he did not take Ms. McCord's allegation seriously.  (Appx. 73, l. 4— Appx. 81, l. 19).  Mr. Robinson's deposition was taken on April 20, 2020 (Appx. 72).  Initially, Mr. Robinson did not even recall what incident the attorneys were asking him about.  (Appx. 73, l. 19—Appx. 75, l. 10).  He said that Ms. McCord has "said a lot of things in the past," she "had a lot of crazy things going on in her life" and that it "went in one ear and out the other."  *Id*.  The only reason he recently sort of remembered the allegation by Ms. McCord was that Ms.

McCord's boss, Pam Wylie, told him about her deposition in this case.  (Appx. 77, l. 2—18).  He would not have called the police for something like what Ms. McCord described in 2018.  (Appx. 77, l. 24—Appx. 78, l. 3).   He has no recollection of encountering or speaking to Mr. Eaves but he was "told" he did by someone in this case.  (Appx. 78, l. 4—Appx. 79, l. 9).  He did not take Ms. McCord's allegation seriously.  (*Id*; Appx. 80, l. 25—Appx. 81, l. 19).  If he had, he would have written a report, which he did not.  (Appx. 83, l. 22—Appx. 84, l. 6).  Apparently, Ms. McCord's employer also did not take her allegation seriously either, as her boss is in the Kroger store "quite often," but before getting subpoena'd in this case never even asked Mr. Robinson about the alleged encounter.  (Appx. 81, l. 20—Appx. 82, l. 6).

Mr. Robinson also stated that he would have remembered if McCord had reported someone masturbating in the parking lot and he would have reported it.  (Appx. 75, l. 14—Appx. 76, l. 22).  He does not remember her ever reporting anything like that.  *Id*.  Additionally, McCord states on the body cam to Officer Hernandez in March 2018 that she had previously experienced harassment by a man masturbating in the parking lot and that she had called the police, made a report and there was a detective involved.  (Appx. 125).  However, Arlington police department has no record of such a report.  (Appx. 152-155).

D.    MCCORD'S EMPLOYER—PL MARKETING

Employees of PL Marketing rearrange, restock and move products at the Kroger stores. The retail representatives are assigned to a specific store and Ms. McCord was assigned to the Arlington Kroger under the supervision of Pam Wylie, who reported to Garry James, who reported to Heather Crawford.  (Appx. 109, l. 9—Appx. 111, l. 25).   Ms. Wylie testified that, despite her being Ms. McCord's supervisor, she did not even recall the alleged incident with Mr. Eaves until she was subpoena'd to give a deposition in this case.  (Appx. 112, l. 24—Appx. 113,

l. 24).  She had "no idea" whether PL Marketing had an arrangement with Kroger to address harassment of a PL Marketing by a Kroger customer.  (Appx. 114, l. 14—18).  She has _no_ recollection of Ms. McCord reporting an encounter with Mr. Eaves.  (Appx. 115, l. 25—Appx. 116, l. 3).  She has never spoken to Tiffany about it or the store manager about it.  (Appx. 117, l. 4—12).

    E.     THE SHAM INVESTIGATION

    1.     Carrier Policies (Appx. 137-147)

Carrier's policies require investigations of harassment or of ethics violations to be conducted "thoroughly and promptly." (Appx. 139; 141).  According to Carrier's Ethics policy, "discipline must be applied fairly, based upon the facts and circumstances of the violation." (Appx. 143, par. 3).  The policy further suggests that the employee's history with the company could be an important factor.  _Id._

    2.     The Non-Investigation

Mr. Lively testified that his investigation was not concluded until he interviewed Mr. Eaves after Mr. Eaves returned from having knee surgery.  (Appx. 66, l. 23—Appx. 67, l.11). Appx. 149 is an email to Mr. Lively from Stan Davis, who was Mr. Eaves' boss' boss (Amy Bell's boss) on April 5, 2018—before the company did an investigation.  Mr. Lively admits that in this email, Stan Davis was telling Mr. Lively, in effect, to investigate Mr. Eaves so that Carrier could fire him.  (Appx. 67, l. 19—21).  Mr. Davis states "[i]n our opinion Larry Eaves should be immediately released from employment with Carrier because of this incident."  He then goes on to give contact information so that Mr. Lively can do an "investigation."  Appx. 149.  This itself violates Carrier policy.  Mr. Lively admits that Mr. Davis wanted Eaves fired just based on the allegation alone.   (Appx. 68, l. 11—19).

Lively recognizes that people can be motivated to complain of being harassed for reasons other than truthful ones.   (Appx. 18-19, l. 20;  Appx. 20, l. 8—24).   Lively understood that Carrier's policies required him to obtain all relevant information in order to do a thorough investigation. (Appx. 24, l. 20—24).  "Thorough" means obtaining the necessary information to make an informed decision.  (Appx. 21, l. 16—18).   He was aware that Carrier promised its employees a thorough investigation.  (Appx. 22, l. 24—Appx. 23, l. 11).   He acknowledges that it would be wrong to take one person's word over another's based upon gender.   (Appx. 25, l. 11—21).   However, he thinks there are times when you could just take a woman's word for it regarding her allegations.  (Appx. 26, l. 8—Appx. 27, l. 18).

In Mr. Lively's alleged investigation, he did not review any audio or video.  (Appx. 28, l. 1—2).   He acknowledges that it is important to assess the credibility of the accuser and important to speak to them.  (Appx. 42, l. 19—24).   He did not interview Ms. McCord.  (Appx. 28, l. 23—Appx. 29, l. 2).   He did not interview the store manager.  *Id*.   He did not even bother to find out that Ms. McCord was not a Kroger employee.  (Appx. 30, l. 13—25).   He did not go to the Kroger and he did not inquire as to the extent of camera coverage.  (Appx. 34, l. 15—24).  He did not talk to the officer that responded to Ms. McCord's call.  (Appx. 43, l. 21—23).   He did not even inquire as to whether there were other witnesses on the grocery aisle.  (Appx. 48, l. 9—12).  He did not review or ask to review the pictures taken by Ms. McCord of the company van.  (Appx. 51, l. 12—20).

What was Ms. McCord purportedly doing while Mr. Eaves was rubbing his hand across her back and abdomen?   Lively has no idea.  (Appx. 46, l. 13—18).   He did not inquire regarding the context of the scene: were there boxes stacked around, was Mr. Eaves pushing a cart, where the lunch sacks were, etc.  (Appx. 47, l. 9—Appx. 48, l. 8).   He does not know

8

whether or not Mr. Eaves was still at the store when the police officer arrived.  (Appx. 52, l.13—21).

Lively's investigation constituted of talking to two people—Detective Green and Larry Eaves.  (Appx. 30, l. 8—9).  He didn't even ask Detective Green if he, Green, had spoken to Ms. McCord.  (Appx. 44, l. 8—Appx. 85, l. 1).

F.     BLATANT PRETEXT

Lively made three "findings" that were the basis of termination:    1. Mr. Eaves lied about being confronted by the store manager; 2. Mr. Eaves lied about being at the store; and 3. Mr. Eaves probably touched Ms. McCord inappropriately.    (Appx. 56, l. 15—Appx. 58, l.14). The only source for the finding that Mr. Eaves lied about being at the store was Detective Green. (Appx. 59, l. 3—9.   The only source for the finding that Mr. Eaves lied about being confronted by the store manager was Detective Green.  (Appx. 59, l. 10—Appx. 60, l. 17).  Mr. Lively does not know if Detective Green ever spoke with the store manager (he did not), and he did not ask to see the video of any alleged encounter between the store manager and Mr. Eaves (there is not any, despite the fact that the cameras covered the front and exit).  *Id*.  Mr. Lively did not ask and does not know where the alleged encounter even took place.   Mr. Lively admits that he had no information from a direct source other than Mr. Eaves about his interaction with the store manager.  *Id*.  He also admits that if they had pictures of Mr. Eaves at the checkout (Appx. 134) and pictures of Mr. Eaves leaving (Appx. 135), it would raise the question of why there were no pictures of any alleged encounter between Mr. Eaves and the store manager.  (Appx. 61, l. 9—Appx. 62, l. 12).  But Mr. Lively never asked anyone for any pictures or any audio or any video. *Id.*

9

Lively admits that as the investigator, he should have had facts to support his conclusions separate and apart from Detective Green's conclusions:

Q:  But my point is, whether Detective Green believed it or not, didn't you yourself have to know if there were any facts to support such a conclusion?

A:  I mean, certainly would to be able to make a decision, yes.

(Appx. 64, l. 20—25)

...............

Q:  So my question is, what information did you get that this woman's allegations were true?

A:  There was no definitive information that I got from the woman's allegations to say that they were true or not true.

(Appx. 33, l. 17—21).

Firing Mr. Eaves under these circumstances is a violation of Carrier's policy which requires that "discipline must be applied fairly, based upon the facts and circumstances of the violation."  (Appx. 143, par. 3)

1.      Conversation with Detective Green

Lively claims that Mr. Eaves lied about his conversation with Detective Green because Mr. Eaves said that he did not "deny" being at the Kroger to Detective Green.  It is undisputed that Mr. Eaves had no notice about why Detective Green was trying to contact him.  (Appx. 53, l. 5—Appx. 55, l. 20).  He was simply told, two weeks after he had been at the Kroger, to call an Arlington detective named Green with no information as to what it was about. (Appx. 1-4).  The conversation was recorded and the recording is attached as Appx. 126.  The following is a transcription of the portion addressed by Lively's assertion that Mr. Eaves "denied" being at the store:

10

Det.=Detective Green;  LE=Larry Eaves

Det.  Mr. Eaves,
LE  Uh huh
Det.  I'm Detective Green, Arlington Police Department.
LE  Ok
Det.  Yeah, I made an inquiry from your vehicle, the white van
LE  Uh huh
Det.  That's where I made the inquiry.  Sir, this is about when you were at Kroger's at 301 S. Bowen here in Arlington on March 26th at 1:30 between 1:08 and 1:30 pm
LE  Uh huh
Det.  Can you tell me a little bit about your visit to the store that day?
LE  Oh, gosh, it's been what—two weeks ago?
Det.  Well, it was Monday before last, yes.
LE  I really don't remember, I don't even remember going there, especially at 1pm
Det.  All right today, today is Wednesday the 4th, April 4th, this was Monday, which would be the Monday before last, which would be the 26th.  It's there at Bowen and Abram.  Did you go there shopping that day?
LE  **To be honest with you, I really couldn't tell you, say yes or no, I mean I might have.** But at one o'clock I should have been in Dallas.
Det.  OK.  Well this, at 1:08 to 1:30 we've got a young lady making a complaint saying that you made contact with her in there asking her where something was, I think it was lunch sacks or something of that nature and she was installing shelves making a display and that you made inappropriate contact with her, that you rubbed her on her abdominal region, on her stomach.
LE  That's false.  I do remember a lady in there one day, I can't remember what day it was but no I did not—I might have asked her where the lunch sacks were, but I did not lay a hand on that lady.
Det.  Did you give her a hug or anything like that?
LE  No!
Det.  Ok, you didn't make any physical contact at all?
LE  No sir

Lively acknowledges that saying maybe I was there and maybe I wasn't is not a "denial."  (Appx. 32, l. 11—18).  He acknowledges that if anyone asked him where he was on a specific day two weeks prior, he would have to stop and think about it.  (Appx. 54, l. 2—12).  In his deposition, Mr. Lively admits that Mr. Eaves did <u>not</u> lie about being at the store.

Q:  So when [Mr. Eaves] tells you [in your interview of him] "I didn't deny being there," that's actually true, isn't it?

A:  It is

(Appx. 63, l. 14—16; also Appx. 70, l. 20—25).

Mr. Lively's deposition was taken on February 28, 2020.  (Appx. 17).  Mr. Lively has subsequently submitted a sworn affidavit to this Court dated May 5, 2020.  (Def. Appx. 209—214).  Despite hearing the store manager on the bodycam say that Larry said "nothing" to him and despite admitting in his deposition that Mr. Eaves did not lie about being at the store, he told the Court in his affidavit that "[t]o this day, I still believe that Larry lied during my investigation and that he likely engaged in the conduct alleged."  *Id.* at par. 15.   His sworn affidavit directly contradicts his sworn deposition testimony.

2.      Conversation with Store Manager John Robinson

The Defendant claims that a big part of the decision to fire Mr. Eaves was also because Detective Green told him that the store manager, John Robinson, "approached Eaves and asked if he touched and talked to the woman, and Larry denied doing so." (Lively Aff., Def Appx. 211, par. 7).  Neither Lively nor Detective Green ever spoke to (or even tried to speak to) the store manager, John Robinson. (Appx. 6, l. 6—7).   The only communication anyone had with Mr. Robinson was when Officer Hernandez spoke to him for two minutes total (including the time spent looking for Mr. Eaves on the store security cameras).  The conversation was captured on Officer Hernandez's body camera while they were in Mr. Robinson's office looking through camera footage.  What was said about the manager's interaction with Mr. Eaves is as follows:

(JH=Office Juan Hernandez;  JR=Store Manager John Robinson; TM=Tiffany McCord)

**JH Oh, y'all did go up to him and talk to him?**
**JR Yeah, I did**
**JH What did he tell you?**
**JR Nothing**
**JH Just nothing?**
**JR Nothing**
JR What time...Tiffany, what time was that again [referring to the alleged encounter]?
TM 1:08, 1:12

JR [clicking through pictures on computer]  Right in here somewhere.  Is that him?  No that's not him.  There he is [referring to Mr. Eaves at the checkout]
TM There he is
JH  That's him?
JR  Mmm hmm
JR  Want me to get him going out the door?
JH  Please, yeah if we can get a better view so I can take a picture with my camera.

When Officer Hernandez wrote up his report, he changed what the store manager said about his communication with Mr. Eaves to "store manager John went up to the W/M and asked hm about the incident.  John stated that the W/M denied everything, paid, and walked out of the location."   Obviously, that is different than Mr. Eaves said "nothing."  Importantly, Detective Green's testimony directly contradicts Lively's affidavit about the store manager:

Q:  So you don't know whether or not Mr. Robinson confronted Mr. Eaves or what he said or what Mr. Eaves said in response?

A:  That's correct.

Q:  And so did you provide information—detailed information to Mr. Eaves' employer about what Mr. Robinson did or didn't do?

A:  Not that I recall.

(Appx. 13, l. 13—22)

3.    Additional Credibility Issues for the Defendant

Mr. Lively claimed initially in his deposition that he did not know that there was an audio recording of Detective Green's conversation with Mr. Eaves.  (Appx. 29, l. 3—7).  He even said that if he had known of the audio, he would have listened to it.  (Appx. 41, l. 8—16).  Mr. Lively was then confronted with his own interview notes that state "conversation was recorded." (Appx. 49, l. 22—Appx. 50, l. 7.).

13

Mr. Lively testified that he relied on Detective Green because Green was "*adamant*" that there had been inappropriate behavior.  (Appx. 37, l. 8—18; Appx. 39, l. 10—13).   However, Green testified differently.  Green testified that he never offered an opinion about whether Mr. Eaves did or did not act inappropriately.  (Appx. 7, l. 7—11).

Q:  And you didn't tell [Carrier] that you had drawn any conclusions about Mr. Eaves' behavior before—during your conversation with the employer, did you?

A:  Yeah, I don't—I didn't draw any conclusions on Mr. Eaves.  I don't—I don't know the man. I just had a phone conversation with him.

(Appx. 8, l. 4—10)

Green also said that he did not draw any conclusions about whether Mr. Eaves said anything inappropriate to Ms. McCord.  (Appx. 9, l. 4—18).   In fact, Green testified that his conversation with Mr. Lively only lasted a few minutes, it was a general overview of the charges and Green did not offer opinions regarding guilt or innocence.  (Appx. 10, l. 12—Appx. 11, l. 12).

Note also that Lively's affidavit changes his testimony that Green was "*adamant*" that Eaves had engaged in inappropriate behavior (said before Green's deposition) to that Lively was "left with the impression" that Green believed there had been inappropriate contact (affidavit prepared after Green's deposition)(Def. Appx. 211 par. 9).

Corporate policies suggest that the employee's history with the company could be an important factor in assessing discipline and that "fairness" is important, yet the DRC Report makes no mention whatsoever of the facts that Mr. Eaves was a twenty year employee who had never received a single complaint about his conduct and that his recent performance evaluation reflected that his boss was "grateful" to have him on her team.  (Appx. 150-151).

14

Carrier, through Lively, took the word of a woman in a grocery store, not an employee of Carrier, who Lively didn't know, never spoke to, and never met  (Appx. 28, l. 5—10) over the word of a 20 year employee who has never had any allegation of harassment—or even conduct complaint of any kind—against him.  (Appx. 28, l. 11—14) and recommended firing Mr. Eaves. (Appx. 31, l. 1—5).  The DRC Committee did not do its own investigation but acted on the recommendation of Lively to fire Mr. Eaves.  *Id.*  Mr. Eaves was fired by Mr. Lively and Mr. Davis (who wrote the email that Mr. Eaves was to be fired). (Appx. 1-4).

G.     REPLACEMENT

Prior to Mr. Eaves' termination, there were three employees in Controls—Mr. Eaves, Boyce Cotton and David Briether. (Appx. 1-4). After Carrier fired Eaves, there were two employees in Controls. *Id.*  Carrier then hired an employee named Demetrius to replace Eaves in Controls.  *Id.*  Boyce Cotton then called Mr. Eaves to tell him that Demetrius had replaced him but needed training. *Id.*  Cotton asked Eaves if Eaves would train Demetrius and Demetrius would pay Eaves out of his pocket.  *Id.*  Mr. Cotton said that Demetrius was forty-four years old. *Id*.

III.     THE LAW

A.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." In making this determination, "we view the evidence and all factual inferences from that evidence in the light most favorable to the party opposing the motion and all reasonable doubts about the facts are resolved in favor of the nonmoving litigant."  *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 349 (5th Cir. 2005)

B.      TCHRA STANDARD

Section 21.051 of the TCHRA provides that an employer commits an unlawful employment practice if it fails or refuses to hire, discharges, or otherwise discriminates in any manner against an employee in connection with compensation or the terms, conditions, or privileges of employment because of the employee's race, color, disability, religion, sex, national origin, or age. Tex. Lab. Code Ann. § 21.051(1) (West 2015). A TCHRA plaintiff can prove discrimination by either direct or circumstantial evidence. *Garcia*, 372 S.W.3d at 634. "The first method, rather straightforward, involves proving discriminatory intent via direct evidence of what the defendant did and said." *Id.* But because direct evidence of discrimination is often "hard to come by," the plaintiff can also rely on circumstantial evidence using "the burden-shifting mechanism of *McDonnell Douglas*." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973) ). "Under this framework, the plaintiff is entitled to a presumption of discrimination if she meets the 'minimal' initial burden of establishing a prima facie case of discrimination."[3] *Id.* "Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case is not onerous." *Garcia*, 372 S.W.3d at 634 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094 (1981) ).

1.      Prima Facie Case

An important omission from the Defendant's recitation of the elements of a *prima facie* case is that the fourth prong can be established by showing that an employee was "otherwise discharged because of his sex/age."  In a TCHRA/Title VII case, the plaintiff must first prove by a preponderance of the evidence a *prima facie* case of discrimination. The plaintiff may prove his case by direct or circumstantial evidence. *U.S. Postal Service Bd. of Govs. v. Aikens,* 460 U.S.

711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). A plaintiff makes out a *prima facie* case

of sex/age discrimination by proving: 1) he was discharged; 2) he was qualified for the position;

3) he was within the protected class at the time of discharge; and 4) he was replaced by someone

outside the protected class, or **otherwise discharged because of [his] sex**. *Bodenheimer v. PPG*

*Indus., Inc.,* 5 F.3d 955, 957 (5th Cir.1993)(emphasis added).   *Sanders v. Casa View Baptist*

*Church*, 898 F. Supp. 1169, 1180 (N.D. Tex. 1995), *aff'd,* 134 F.3d 331 (5th Cir. 1998) (see also

*Texas Dep't of Aging & Disability Servs. v. Loya*, 491 S.W.3d 920, 924 (Tex. App. 2016) holding

that the same is true under the Texas Commission on Human Rights Act).

a) Gender

There is no dispute that Mr. Eaves was discharged.  There is no dispute that he was

qualified for the position and, in fact, had successfully filled it for 15 years.  Mr. Eaves, as a

male, is a member of a protected class.  *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75,

78 (1993).  Thus, the issue is whether he was otherwise discharged based upon his gender.  The

question is whether his gender "played a role in" Defendant's decision-making process.  *Reeves*

*v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 140 (2000); *Rhodes v. Guiberson Oil*

*Tools,* 75 F.3d 989 (5th Cir.1996) (*en banc* ).  It is clear that Mr. Eaves' gender played a

motivating role in the decision-making process.  From the very beginning and throughout the

alleged "investigation," it was clear that assumptions were made against Mr. Eaves because the

allegations came from a woman.  Mr. Lively testified repeatedly that just the fact that she had

made the complaint—called the police—caused him to believe her. (Appx. 33, l.—Appx. 38, l.

20).  There was no attempt to assess her credibility, her past conduct or other potential

motivations for making the allegation.  The information was clearly filtered through bias goggles

in that anything that remotely may have supported the woman's claim was embraced almost

17

without question and anything offered by Mr. Eaves was rejected almost without question. Indeed, they went so far as to manufacture "evidence" against Mr. Eaves that did not exist. Mr. Lively admitted in his deposition that Mr. Eaves had not lied because, fortunately, the two things Lively accused Eaves of lying about are recorded. Yet, inexplicably, Lively has provided to this Court an affidavit in which he still swears that Mr. Eaves lied. There can be no stronger indication of bias. Furthermore, none of the information that supported Mr. Eaves was included in the DRC Report—not even that he had worked for them for twenty years without complaint. There was no mention that his conversation with the Detective had been recorded and could be verified (and no attempt to do so), even though such information was in Lively's interview notes. Mr. Lively's bias was so blatant in the investigation that it shocks the conscience.

b) Age

"In order to establish a prima facie case of age discrimination under the TCHRA, a plaintiff must prove that [he] '(1) is a member of a protected class; (2) was discharged; (3) was qualified for the position from which [he] was discharged; and (4) was either replaced by someone outside the protected class, replaced by someone younger, or was otherwise discharged because of [his] age.' Once the plaintiff establishes a prima facie case, the 'burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the disparate treatment.' If the employer comes forward with nondiscriminatory reasons for the employment decision, the plaintiff is 'required to show either 1) the reasons were not true but, rather, were a pretext for discrimination, or 2) even if the reasons were true, another motivating factor was ... age.' *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005)

There is no dispute that Mr. Eaves was discharged. There is no dispute that he was qualified for the position and, in fact, had successfully filled it for 15 years. He was 69 years old

at the time of his termination. (Appx. 127-129).  Thus, he falls within the protected class.  He was replaced by someone who was forty-four years old, which falls within the "substantially younger" category.  Thus, Mr. Eaves has established a prima facie case of age discrimination.

      2.      Pretext

The factfinder may rely on all the evidence in the record to draw this inference of discrimination. "In tandem with a prima facie case, the evidence allowing rejection of the employer's proffered reasons will often, perhaps usually, permit a finding of discrimination without additional evidence." *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir. 1996); *Appel v. Inspire Pharmaceuticals, Inc*., 712 F.Supp.2d 538, 544 (N.D. Tex. 2010).  Thus, a jury issue will be presented and a plaintiff can avoid summary judgment and judgment as a matter of law if the evidence taken as a whole (1) creates a fact issue as to whether the employer's stated reason was what actually motivated the employer and (2) creates a reasonable inference that the protected category (age or gender) was a motivating factor in the actions of which plaintiff complains. *Id.*

In *Stanton v. Jarvis Christian College*, 417 F.Supp.3d 811, 824 (E.D. Tex. 2019), the employer explained that the plaintiff "was fired for stealing and destroying" property, including deleting files from her computer.  The plaintiff claimed that the items taken were her property and that the employer did not follow its own policy with respect to her discipline.  The court found that this was sufficient to create a fact issue on the matter of pretext.

The evidence of pretext in this case is overwhelming, beginning with the email from the Area Operations Manager to Human Resources instructing that the investigation was to be conducted <u>in order</u> to fire Mr. Eaves.  Lively admits that as the investigator, he should have had facts to support his conclusions separate and apart from Detective Green's conclusions:

19

Q:  But my point is, whether Detective Green believed it or not, didn't you yourself have to know if there were any facts to support such a conclusion?

A:  I mean, certainly would to be able to make a decision, yes.

(Appx. 64, l. 20—25)

...............

Q:  So my question is, what information did you get that this woman's allegations were true?

A:  There was no definitive information that I got from the woman's allegations to say that they were true or not true.

(Appx. 33, l. 17—21).

Importantly, Lively claims that he relied heavily on Detective Green's opinions that Mr. Eaves had acted inappropriately.  Yet Detective Green testified that he did not share any opinions with Lively about whether Mr. Eaves did or did not act inappropriately. Mr. Lively changed his story after Green's deposition to say that he merely got the "impression" that Green thought that Mr. Eaves was guilty.  However, not only does that raise a very material fact issue as to what Mr. Lively relied upon, it also raises a substantial issue as to Mr. Lively's credibility.

In addressing the issue of pretext, the question is whether Carrier *reasonably* believed the information *in good faith*.  *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 393 (5th Cir. 2013) ("the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the...allegation and acted on it in good faith").  The Fifth Circuit has long recognized that evidence of a "sham"/ insufficient investigation under suspicious circumstances can show pretext for adverse employment actions taken against an employee. See, e.g., *Rachid v. Jack in The Box, Inc.*, 376 F.3d 305, 314, fn. 13 (5th Cir. 2004) (where the Court found it suspicious in an ADEA case that HR manager investigated plaintiff for altering time-cards, determined he had done so,

20

and terminated plaintiff "without further investigation" in order "to determine whether those deletions by plaintiff were accurate"); *Ion v. Chevron*, 731, F.3d 379 (5th Cir. 2013) ("[Defendant's] failure to conduct even the most cursory investigation, confront [plaintiff] about Peel's statements, or seek a second opinion under the FMLA calls into doubt [defendant's] reasonable reliance and good faith on Peel's statements, and, at the very least, creates a fact issue as to whether it could have terminated [plaintiff] despite its retaliatory motive.").

Plaintiff does not contend that Carrier had to be right, but it did have to be honest.  It had to have acted in "good faith."  Carrier admits that it had no facts to support Ms. McCord's claim, that it failed to consider Mr. Eaves' history with the company as stated in company policy, and that company policy required a "thorough" investigation.   There are a number of statements in Lively's affidavit that directly conflict with his deposition, which belie his "good faith," including a misrepresentation that he relied upon Detective Green's "adamant" assertion that Mr. Eaves had acted inappropriately (whereas Green testified that he offered so such opinion). Furthermore, Lively tried to deny that he was aware that the Green/Eaves conversation had been recorded, not realizing in his testimony that he had written that into his notes.  He also claimed that Green told him specifically that the store manager had confronted Mr. Eaves as to whether he had touched an employee and Mr. Eaves denied it, where Green testified he had no idea what was said by the manager or Mr. Eaves.  How can there possibly be "good faith" when Mr. Lively has made so many misrepresentations about the type and amount of information he received? Plaintiff asserts that his substantial credibility issues must be determined by a fact finder.

IV.     CONCLUSION

There are substantial issues of material fact that must be resolved by a fact finder.  In particular, there are issues related to the credibility of the person, Will Lively, who

recommended termination and credibility terminations must be resolved by the fact finder. Furthermore, there are many indicators that the company had decided to fire Mr. Eaves before ever conducting an investigation (including an email that literally says as much) which presents strong evidence of pretext.  Thus, Defendant's motion should be denied as a matter of law.

WHEREFORE, Plaintiff prays that the Court deny Defendant's Motion and for such further relief as justice may require.

Respectfully submitted,

s/Susan E. Hutchison
Texas Bar No. 10354100
hutch@hsjustice.com

James Robert Hudson, Jr.
Texas Bar No. 24094736
jr@hsjustice.com

Hutchison & Stoy, PLLC
505 Pecan St., Ste. 101
Fort Worth, Texas 76102
Phone:  817-820-0100
Fax:   817-820-0111

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

This is to certify that on this 1st day of June 2020, a true and correct copy of the above and foregoing document was served on the following attorney of record via the court's electronic service:

Stephanie Manning
smanning@seyfarth.com
Esteban Shardonofsky
sshardonofsky@seyfarth.com
Seyfarth Shaw LLP
700 Milam, Ste. 1400
Houston, TX  77002

s/Susan E. Hutchison
Susan E. Hutchison